UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WASTE MANAGEMENT OF LOUISIANA, LLC, | ) ) ) | |
| Plaintiff | ) ) | Civil Complaint |
| v. | ) ) | Case No. _____ |
| RIVER BIRCH, INC., HIGHWAY 90, LLC, FREDERICK R. HEEBE, and ALBERT J. WARD, JR. | ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

COMES NOW Plaintiff Waste Management of Louisiana, LLC ("Waste Management"), by and through its undersigned counsel, and for its Complaint against Defendants River Birch, Inc., Highway 90, LLC, Frederick R. Heebe, and Albert J. Ward, states and alleges the following:

## INTRODUCTION

1.      This case arises out of the unlawful, corrupt, and anticompetitive pattern of conduct by Defendants River Birch, Inc., its owners, officers, and affiliated entities, (collectively, "the River Birch Defendants"), taken in concert with other alleged co-conspirators, known and unknown, in an effort to dominate the landfill disposal business in the greater New Orleans metro area.

2.      Spanning a period of several years, the River Birch Defendants have participated in a long-running conspiracy to limit and exclude competition for landfill disposal services in and around New Orleans.  Actions taken pursuant to this conspiracy include

the systematic corruption of the political and administrative processes and the misuse of the judicial process as part of a concerted effort to "kneecap" rival landfill operators serving greater New Orleans, and thereby, to allow the River Birch Defendants to line their pockets at the expense of the Federal Emergency Management Agency ("FEMA") as well as the taxpayers, residents and businesses of the New Orleans area.

3.      A particularly notable and callous example of the River Birch Defendants' unlawful actions that recently came to light as a result of an ongoing criminal investigation had its origins in the unprecedented demolition and clean-up following the devastation caused by Hurricane Katrina and its aftermath.  By some estimates, in the years immediately following Hurricane Katrina, FEMA spent approximately $150 million dollars on landfill disposal to help clear New Orleans and its environs of storm debris and destroyed buildings so as to expedite the rebuilding process.  Under any circumstance, as one of the three approved "Construction and Debris" ("C&D") landfill operators for the Katrina clean-up operation, the River Birch Defendants would have benefitted handsomely from their share of the massive clean-up efforts.  Apparently, the River Birch Defendants wanted more.

4.      Putting their own financial interest ahead of the needs of New Orleans to rebuild, the River Birch Defendants singled-out their two primary C&D landfill competitors as the targets of a relentless, multi-faceted campaign of anticompetitive and wrongful conduct. Notably, these two landfills had been permitted and/or approved in the wake of Hurricane Katrina for the specific purpose of helping to expedite the clean-up of New Orleans.  Defendants' improper actions included outright bribery of political figures, secret payments to media personalities purporting to act in the public interest and the sponsoring of sham litigation.  These actions were all in an effort to unlawfully and unfairly influence the approval, permitting and operations of its landfill competitors.

5.      A  C&D landfill in New Orleans East owned and operated by Waste Management -- the "Chef Menteur" landfill -- was one of the targets of the River Birch Defendants'

wrongful conduct.  Ultimately, Waste Management was unable to overcome and survive Defendants' unlawful conduct, and, as a result, in August 2006 after only 6 months of operations, the Chef Menteur landfill was permanently closed.

6.     Defendants' greed came at a high price.    The Louisiana Department of Environmental Quality ("LDEQ") advised that the closure of the Chef Menteur facility would be expected to "significantly imped[e] disaster clean-up and recovery for the City of New Orleans" and would cause the "the estimated time for processing of debris and demolition of structures to increase substantially."   A post-closure report by FEMA's office of the Inspector General confirmed the LDEQ's expectations.  It found that the Army Corps of Engineers "use of Chef Menteur was more cost effective and productive than the use of [River Birch's] Highway 90;" and that the "closing of Chef Menteur resulted in higher costs and slower debris removal."   Because of the loss of Chef Menteur as a disposal option and the increased hauling distance from New Orleans East to Highway 90 relative to Chef Menteur, FEMA suffered from a "decrease of 15 percent in the daily volume [of storm debris] delivered to Highway 90" and "an increase in daily costs of about $19,000" for that reduced disposal.

7.     The River Birch Defendants' wrongful conduct that caused the closure of the Chef Menteur landfill not only damaged Waste Management, but it deprived New Orleans of a safe and cost-effective C&D disposal option for the immense volume of storm-related debris in the wake of Hurricane Katrina.  Waste Management suffered from the diversion of profitable waste streams from Chef Menteur to River Birch landfills. By delaying and impeding the rebuilding of the flood-ravaged city, however, the River Birch Defendants extracted a far greater cost on the citizens of New Orleans.

8.     As the reported criminal investigation of the River Birch Defendants unfolds, it has become apparent that the Defendants' reliance on dirty tricks, improper influence of public officials, and the abuse of the political process as part of a concerted effort to prevent competition was not an isolated event, limited to Waste Management's Chef

Menteur landfill.  Although the full extent of Defendants' wrongful conduct and the reach of its conspiracy has not come to light, upon information and belief, Defendants' pattern of unfair competition and outright corruption designed to restrict or eliminate landfill disposal competition appears also to have targeted the Old Gentilly Landfill in New Orleans, the Jefferson Parish landfill operated by Waste Management, and perhaps extends even to Waste Management's Pecan Grove and Central landfills in Southern Mississippi and Woodside Landfill in Walker, Louisiana.

9.     The recent Jefferson-Parish landfill disposal contract represents another notable incident in Defendants' pattern of anticompetitive conduct.  In this instance, the River Birch Defendants corrupted a public bidding process and ultimately extracted a 25-year exclusive contract to dispose of municipal solid waste from Jefferson Parish at the River Birch landfill.   Defendants secured this windfall by, among other things, providing undisclosed financial benefits to members of the Jefferson Parish Administration and certain of the Administration's principal staff members involved in the manipulation, solicitation, evaluation, negotiation, and approval of that waste disposal contract.  Parish co-conspirators included Aaron Broussard, former president of Jefferson Parish, Tim Whitmer, Chief Administrative Officer, and Tom Wilkinson, Parish Attorney.

10.     In exchange for financial benefits from the River Birch Defendants, these Jefferson Parish officials rigged the bidding process, deceived the Parish Council, the taxpaying citizens of Jefferson Parish, and River Birch's competitors, and attempted to manipulate the Parish budget as part of an effort to steer the award of an exclusive disposal contract at River Birch.  Notably, in comparison with the continued operation of the Parish Landfill under the existing Waste Management contract, the River Birch Contract would be a financial detriment to the citizens of Jefferson Parish costing them millions more to dispose of their waste, and rendering one of Jefferson Parish's most valuable assets, its landfill, worthless.

11.     Moreover, although not solicited or required by the Request for Proposal to which it responded, the River Birch secured from Jefferson Parish a commitment to shut-down its Waste Management-operated landfill for a period of 25 years.   As a result, River Birch was able to secure a waste disposal contact that would eliminate the Jefferson Parish landfill and Waste Management as a source of waste disposal competition.   The River Birch contract with Jefferson Parish was not only a bad deal for the taxpayers of Jefferson Parish, it was designed and intended to leave the commercial waste generators that previously had benefited from the competition between the Jefferson Parish-Waste Management landfill vulnerable to River Birch's resulting monopoly over landfill disposal rates.

12.     The River Birch Defendants' conduct as set forth in this Complaint is far-removed from normal political activity or legitimate petitioning conduct and cannot be excused as vigorous advocacy.   More than simply using the political process to increase its business, Defendants abused and corrupted this process to attempt to maliciously drive Waste Management and its other competitors out of business in the greater New Orleans area.   So complete was River Birch's corruption of the political process, that in the case of the Jefferson Parish-River Birch contract, upon exposure of the improper influence by River Birch and its co-conspirators and the irregularities in the award of that contract, the Jefferson Parish council has sought to repudiate that contract as the product of fraud and deceit.   In other words, through the manipulation of the Parish Administration and the contracting process, the River Birch Defendants and their co-conspirators had effectively supplanted the political process and role of the council.

13.     To date, Defendants' conduct has resulted in the criminal indictment and prosecution of a former Louisiana state politician, the resignations of Jefferson Parish officials who are the targets of a continuing federal criminal investigation, an FBI raid of the River Birch offices, the revelation of an army of secret and undisclosed "lobbyists,"

and what is rumored to be an ongoing criminal investigation of the River Birch Defendants.

14.    This lawsuit seeks compensation for the financial losses suffered by Waste Management as a direct, proximate, and intended result of Defendants' campaign of unlawful and unethical conduct targeted at eliminating competition for the River Birch landfills.

## THE PARTIES

15.    Plaintiff Waste Management of Louisiana, LLC is a Delaware corporation with its principal place of business in Houston, TX.  Its sole member is Waste Management of Louisiana Holdings I, Inc., a Delaware corporation with its principal place of business in Houston, TX. At all times relevant hereto, Waste Management owned and operated the Chef Menteur C&D landfill in East New Orleans, the Central Landfill in Pearl County, Mississippi, and the Woodside Landfill in Walker, Louisiana, and pursuant to a contract with Jefferson Parish, has operated and still operates a landfill owned by Jefferson Parish.

16.    Defendant River Birch, Inc. ("River Birch") is a Louisiana corporation headquartered in Gretna, Louisiana.  River Birch owns and operates the River Birch landfill, which accepts and disposes of waste from the greater New Orleans area.

17.    Defendant Highway 90 LLC is a Louisiana limited liability company based in Gretna, Louisiana.  Highway 90 LLC owns the Highway 90 landfill, which is a Type III C&D landfill that accepts and disposes of waste from the greater New Orleans area.

18.    Defendant Frederick R. Heebe ("Heebe") is a resident of Louisiana.  Heebe is both a real-estate developer and an owner of co-conspirator Shadowlake Management, Co. ("Shadowlake").  Shadowlake is the parent corporation of River Birch, Inc.  Mr. Heebe has served as Vice President of River Birch Inc.

19.     Defendant Albert J. Ward, Jr. ("Ward") is a resident of Louisiana.  He is the father-in-law of Frederick Heebe.  At all pertinent times, Mr. Ward served as President of River Birch, Inc., and as Manager of Highway 90 LLC.

## THE CO-CONSPIRATORS

20.     Co-conspirator Shadowlake Management, Inc. is a corporate entity with its principal place of business in Gretna, Louisiana.  Shadowlake is owned and controlled by Defendants Heebe and Ward.  Shadowlake is a holding company that serves as the parent company of a number of corporate entities, including River Birch, Inc. and several others.   Upon information and belief, Shadowlake served as the primary instrumentality through which many of the River Birch Defendants' unlawful actions were implemented.

21.     The River Birch Defendants' actions and unlawful conduct directed at eliminating landfill competition were also taken in concert with and with the active knowledge and participation of various co-conspirators, known and unknown, including state and local political figures.

22.     Co-conspirator Henry Mouton is a resident of Louisiana.  Mr. Mouton served as Commissioner of the Louisiana Department of Wildlife and Fisheries from January 2003 until his resignation in November 2008.  Mr. Mouton was indicted for unlawful actions in connection with the River Birch Defendants in 2011.

23.     Co-conspirator Aaron Broussard is a resident of Louisiana.   Mr. Broussard served as President of the Jefferson Parish council from 2004 until his resignation in January 2010.

24.     Co-conspirator Timothy Whitmer is a resident of Louisiana.  Mr. Whitmer served as the Chief Administrative Officer for Jefferson Parish from 1998 until his resignation in January 2010.  Mr. Whitmer was also an owner of Lagniappe Industries, LLC, an entity

through which River Birch provided undisclosed financial benefits to Mr. Whitmer and members of the Jefferson Parish administration.

25.    Co-conspirator Tom Wilkinson is a resident of Louisiana.  Mr. Wilkinson served as the Parish Attorney for Jefferson Parish from 1996 until his resignation in March 2010.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction under 28 U.S.C. Section 1332 because the Plaintiff is a citizen of a different state from all of the Defendants and because the amount in controversy exceeds $75,000.  The Court also has subject matter jurisdiction under 28 U.S.C. Section 1331 and 18 U.S.C. Section 1964(c) over the federal Racketeer Influenced and Corrupt Organizations ("RICO") claims, and because all of the acts complained of arise out of the same series of events and transactions, supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. Section 1367.

27.    Personal jurisdiction and venue are proper in this Court under 18 U.S.C. Section 1965 and under 28 U.S.C. Section 1391.  Defendants reside in, own property in, conduct business in, and are found in the Eastern District of Louisiana.  The weight of the conduct at issue and the harm to competition and to Waste Management took place in this judicial district.

28.    Defendants' unlawful conduct, as alleged herein, had direct and substantial effects on both intrastate and interstate commerce.

## FACTUAL ALLEGATIONS

29.    The River Birch Defendants have engaged in and conspired to engage in a series of unlawful, corrupt, and deceptive acts detrimental to competition, the citizens of New Orleans, FEMA, and to Waste Management over much of the past decade. Defendants' actions have already resulted in federal indictments and investigations of

state and local officials for bribery, corruption, and false statements.   Other public figures who advocated against River Birch's competitors are now revealed to have been acting in their capacity of secret, undisclosed "lobbyists" for River Birch.

30.   Defendants' actions were targeted at Waste Management and other landfill competitors of River Birch Inc. and Highway 90 LLC in and around the greater New Orleans area.   As outlined below, these actions have been the direct and proximate cause of injuries to the finances, business, and property of Waste Management.

## THE CHEF MENTEUR LANDFILL

31.   In late 2005, Hurricane Katrina struck the Gulf Coast near New Orleans causing widespread destruction and setting in motion historic flooding and property damage in and around the City of New Orleans.   The devastation and suffering experienced in New Orleans, and especially the lower Ninth Ward, during Katrina and its aftermath is well known and received worldwide attention.

32.   One of the first tasks necessary to commence the clean-up and rebuilding process involved clearing and disposing of the massive amounts of debris and waste from vegetation and structures damaged by Katrina and ensuing flooding.   Recognizing the need for multiple sources of C&D disposal to expedite the clean-up process, the U.S. Army Corp of Engineers and the Louisiana Department of Environmental Quality ("LDEQ") established an emergency waste disposal plan.

33.   C&D landfills are authorized to handle construction and debris materials, but not industrial or municipal solid waste.   In Louisiana, C&D landfills are known as Type III landfills, and are not subject to the same level of regulatory standards or obligations as landfills that are permitted to handle industrial and municipal solid waste (known as Type I and II landfills in Louisiana).

34.   Utilizing his emergency powers, in February 2006, then Mayor Nagin executed an Emergency Disaster Cleanup Site Request authorizing Waste Management to

operate a C&D landfill at its "pre-approved" site in New Orleans East, off the Chef Menteur highway.   In exercising his emergency authority, Mayor Nagin's Order superseded the normal processes of the Comprehensive Zoning Ordinance applicable to permitting a C&D landfill and granted the necessary approval.  Waste Management expended considerable sums to prepare the site and to obtain the requisite approvals to operate the Chef Menteur landfill.

35.   In 2006, the LDEQ publicly recognized that the Chef Menteur landfill "is technically sound, meets requirements and is in close proximity to some of the most devastated areas of Orleans Parish."  After completing its analysis of Chef Menteur, the LDEQ concluded that "[t]his site is needed to clean up New Orleans in a timely, environmentally sound manner."  Chef Menteur commenced operations in April 2006. Steps were taken by Waste Management, the LDEQ and the U.S. Environmental Protection Agency to minimize unauthorized waste streams.  Air and water sample testing by the LDEQ in May and June 2006 found no health risks from its operation.

36.   Despite the emergency circumstances and the express approval and endorsement of the Mayor, the LDEQ and the Army Corps of Engineers, as well as the actions and investments by Waste Management in reliance thereon, almost immediately following its opening, the Chef Menteur landfill (as well as the Old Gentilly landfill that was re-opened and authorized to handle post-Katrina C&D) became the target of a wide-ranging public opposition campaign.  Only now, in light of recent disclosures stemming from the criminal investigation of the River Birch Defendants, has it been revealed that this opposition campaign was financed, organized and supported by the River Birch Defendants' and certain political and public figures acting at their behest.

37.   Acts taken pursuant to the River Birch Defendants' efforts to thwart the operation of competing C&D landfills appear to have included sponsoring sham lawsuits challenging the issuance, authorization and permitting of the landfill, obtaining proposed blocking legislation, seeking additional and unprecedented environmental compliance

testing of the waste and the imposition of unnecessary leachate barriers, and manufacturing the appearance of other forms of public outcry and widespread opposition.   Although such acts may have appeared at the time to be the normal workings of the political process, as revealed in the more recent criminal investigations, Defendants' actions were far from ordinary acts to petition government.

38.    One of the primary criticisms repeatedly leveled against the Chef Menteur landfill concerned its environmental safety, based in large part on its proximity to the nearby Bayou Savage National Wildlife Refuge and the Maxtent Canal.   In that regard, the public opposition fomented by Henry Mouton, then a Louisiana Department of Wildlife and Fisheries Commissioner, was particularly influential.   Starting as early as 2003, Mr. Mouton had been accepting illegal bribes from the River Birch Defendants or others acting at their behest to use his position and influence to further the commercial interests of the River Birch Defendants.   All told, Defendants made more than 100 separate, illegal, and undisclosed payments to Mr. Mouton alone.

39.    During 2005 and 2006, Mr. Mouton was specifically engaged by the River Birch Defendants to oppose the approval, permitting and/or operations of various competing landfills to dispose of Katrina-related debris, including at Waste Management's Chef Menteur C&D landfill and the re-opened Old Gentilly landfill.   All told, Mr. Mouton corruptly and unlawfully accepted more than $400,000 in bribes from the River Birch Defendants "intending to be influenced and rewarded in connection with . . . a series of transactions of the Louisiana Department of Wildlife and Fisheries . . . ."

40.    In exchange for Defendants' unlawful payments, Mr. Mouton held himself out as acting in his public, official capacity as a Commissioner of the Louisiana Department of Wildlife and Fisheries serving the public interest by seeking assistance to prevent the opening and/or continued operation of other C&D landfills in greater New Orleans.   In taking these actions, Mr. Mouton purported to act out of concern over the potential for harm to environmentally sensitive waterways and "preserving Louisiana's natural

resources," and did so without revealing the financial interests and motives of his private benefactors at River Birch. Acting secretly on behalf of the River Birch Defendants, Mr. Mouton personally contacted numerous public officials, including persons at the EPA, the FBI, the U.S. Attorney's Office, 17 U.S. Senators, and others to spread misleading information and to seek their assistance in stopping other C&D landfills from competing with River Birch for post-Katrina waste disposal services under the guise of various environmental concerns.

41.     As one example noted in the federal indictment of Mr. Mouton, "On or about April 6, 2006, Henry M. Mouton, acting on behalf of [a] co-conspirator," believed to be a person or company associated with the River Birch Defendants, "wrote to an official with the Environmental Protection Agency in Washington D.C. and other officials while concealing the financial motivations of himself and others and represented himself as a Commissioner on the Louisiana Department of Wildlife and Fisheries Commission."  In that correspondence, Mr. Mouton provided the EPA with a "Notice of Intention to File Citizen's Suit" based on alleged violations at the Chef Menteur landfill site.  Mr. Mouton took this action on the same date he received an illegal payoff from an entity associated with the River Birch Defendants "to influence and reward him for his official action."

42.     Contrary to the reasoned opinion of the LDEQ as to the suitability of Chef Menteur as an emergency disposal site for C&D waste, Mr. Mouton, again acting as an undisclosed agent of the River Birch Defendants but holding himself out as a Commissioner of the Wildlife and Fisheries Commission, falsely suggested that Waste Management had engaged in an improper "pay-off" of the City of New Orleans to gain the emergency authorization to operate the Chef Menteur landfill site in an inappropriate location.  Although unfounded, Mr. Mouton's allegations were scandalous, materially misleading, and harmful to the reputations of Waste Management and Mayor Nagin.

43.     In addition to bribing public officials to directly pervert the political process, the River Birch Defendants took other actions to successfully manufacture the appearance

of "public opposition" to that landfill so as to prevent or delay competition from Waste Management's Chef Menteur facility.  Specifically, the River Birch Defendants made a substantial, undisclosed interest free and unrecorded "loan" of $250,000 to radio host Garland Robinette after Mr. Robinette, armed with false and misleading information in direct contravention of the LDEQ's informed opinion, routinely railed against the purportedly harmful environmental consequences of opening and operating the Chef Menteur and Old Gentilly landfills.  So effective was Mr. Robinette in corrupting the public dialogue that even the LDEQ felt it was unable to communicate its position on the benefits of the Chef Menteur and Old Gentilly landfills as safe and valuable alternatives to disposal at the River Birch landfills.

44.     In 2006, the Chef Menteur landfill was the subject of various environmental and permitting challenges filed in federal court.  This series of court actions included a claim by the Louisiana Environmental Action Network and other interested citizens and putative public interest groups (hereinafter collectively "LEAN") challenging the LDEQ's issuance of permits to open and operate the landfill.  That lawsuit was objectively baseless and instituted without a reasonable belief in its success, but rather, for the express purpose of interfering with the Chef Menteur's operations.  Upon information and belief, the River Birch Defendants supported and helped to finance the cost of the frivolous LEAN litigation.  Only recently revealed, it appears that the plaintiffs' counsel in the related judicial challenges brought by "concerned citizens" of New Orleans East seeking to challenge "the basis under which Waste Management sough to operate its landfill in an area of the City of New Orleans that is not zoned for such use," Mr. Kyle Schonekas and Ms. Joelle Evans, were both secretly on retainer by the River Birch Defendants as undisclosed "lobbyists."

45.     Upon information and belief, the River Birch Defendants and their secret lobbyists, Schonekas and Evans, also enlisted the services of Walter Willard to assist with their litigation against the Chef Menteur landfill and challenging Mayor Nagin's

emergency authorization.  Mr. Willard was retained, at least in part, to curry favor and political influence.  In particular, Mr. Willard is the brother of Cynthia Willard-Lewis, then the New Orleans Councilperson for District E where the Chef Menteur landfill was located.  At one point, Ms. Willard-Lewis was one of the strongest proponents and supporters of the Chef Menteur landfill because she deemed it critical to expediting the clean-up and recovery of her district in New Orleans East.  This district, which includes the lower 9th Ward, had been especially devastated by Katrina and is located most remotely from the River Birch and Highway 90 landfills.  Upon the retention of her brother to allegedly "assist" in the River Birch -sponsored litigation against the landfill, Ms. Willard-Lewis suddenly reversed course and became a vocal opponent to the continued operation of the Chef Menteur landfill.  Ms. Willard-Lewis attributes her changed position to the public outcry over health and safety concerns arising from the location of the landfill.  This was the very reaction that the River Birch Defendants had had to purchase via their bribes, undisclosed lobbyists, unfounded litigation.

46.  Throughout 2006, Waste Management was forced to expend substantial resources to defend objectively baseless litigation and attempt to counteract the deceitful and multi-faceted opposition campaign sponsored by the River Birch Defendants.  While the breadth and full extent of the River Birch Defendants' improper influence is presently unknown, the effects of that influence were felt, as expected and intended, within the Mayor's Office and the City Council.

47.  Despite the clear determination by the LDEQ and FEMA that the Chef Menteur landfill was an appropriate, safe, and less expensive disposal site than the Highway 90 landfill, and an important asset in expediting the rebuilding of New Orleans, during the Summer of 2006, Mayor Nagin unexpectedly reversed his position and withdrew his emergency authorization for the Chef Menteur landfill.

48.  Given the expedited schedule for clearing and disposing of storm debris established by FEMA, even unfounded and illegitimate attacks that served only to delay

and disrupt competing landfill operations would and did cause harm Waste Management and unjustly enrich the River Birch Defendants.  When Mayor Nagin withdrew his emergency authorization, the Chef Menteur landfill became subject to and out of compliance with the zoning ordinances.  As a result, the LDEQ took the position that, although a superior and less costly option, Chef Menteur would be unavailable for waste disposal.  Similarly, FEMA announced that it would not fund the costs of disposal at unapproved sites, such as Chef Menteur, although superior to its other options.

49.    Given the time constraints alone, it was effectively impossible for Waste Management to obtain the necessary zoning approval so as to be available for the Katrina clean-up.  Indeed, Mayor Nagin's continued exercise of emergency authority suspended the normal zoning processes and Council authority.  Even if the normal processes had been available, given the improper influence that River Birch had exerted over the public debate, including over Cynthia Willard-Lewis, the counsel representative in whose district the landfill was located, zoning approval could never have been obtained in a timely manner.

50.    With no path to timely approval or continued operations, by August 2006, Waste Management was forced to close the Chef Menteur landfill, losing over $50 million of dollars in projected net revenues, plus millions more that had been invested in the landfill.

51.    With the loss of the Chef Menteur landfill, FEMA was forced to spend unnecessary additional funds and devote additional time for waste disposal and transportation to less convenient landfill disposal sites owned by the River Birch Defendants.

## JEFFERSON PARISH WASTE DISPOSAL CONTRACT

52.    As in the case of post-Katrina cleanup, the pattern and practice of the River Birch Defendants improperly influencing public officials to secretly advance their private

financial interests at the expense of River Birch's competitors, and competition itself, was recently repeated in Jefferson Parish.

53.    Jefferson Parish and Waste Management are parties to a Landfill Contract pursuant to which Waste Management operates the Jefferson Parish Landfill.  Although the landfill could be expanded, by its own terms, the Landfill Contract is designed to terminate when the Jefferson Parish Landfill has reached its full permitted capacity.

54.    Unknown to Waste Management, the River Birch Defendants and certain co-conspirators affiliated with Jefferson Parish schemed to prematurely terminate the Landfill Contract with Waste Management prior to its natural term or otherwise to oust Waste Management from operation of the Parish Landfill in order to benefit River Birch.

55.    In 2008, the Jefferson Parish Recycling Committee issued a recommendation that the Parish solicit bids for the disposal of certain "woody waste" in order to achieve recycling goals and reduce capacity in the Parish Landfill.   Pursuant to this recommendation, the Jefferson Parish Environmental Affairs Department drafted a Request for Proposal (RFP No. 176) to solicit bids related recycling and disposal of woody waste.

56.    River Birch co-conspirators Broussard, Whitmer, and Wilkinson, acting pursuant to the conspiracy, took the opportunity presented by the woody waste RFP to advance the goals of the River Birch Defendants by ousting Waste Management from the Parish Landfill and shifting the more lucrative Parish disposal contract to River Birch.

57.    From the outset, the Jefferson Parish contracting process was highly irregular and improper, and upon information and belief, the process was corrupted by improper financial benefits paid by the River Birch Defendants, directly or indirectly, to Messrs. Broussard, Whitmer, and Wilkinson.   For example,  Jefferson Parish's two highest officials, President Aaron Broussard and Chief Administration Officer Tim Whitmer, reviewed and provided changes to the draft RFP prepared by the Environmental Affairs Department.   Those changes vastly expanded and inexplicably altered the scope and

purpose of the RFP beyond the disposal of woody waste.  The revised RFP was issued over the objections of the Environmental Affairs Department.

58.    River Birch responded to the "fishing expedition" invited by the RFP with a proposal that would require the diversion of 100% of Jefferson Parish waste away from the Parish Landfill operated by Waste Management and redirect it exclusively to the River Birch landfill for a period of 25 years.  River Birch's proposal also required that the Jefferson Parish landfill, previously recognized by the Parish and its consultants as one of the Parish's most valuable assets, be shut down during the period of the contract (a period of at least 25 years) and that the Waste Management contract be prematurely terminated.

59.    As part of the conspiracy and in return for financial benefits from the River Birch Defendants, co-conspirators Broussard, Wilkinson and Whitmer violated Parish ordinances and orchestrated an improper evaluation of River Birch's bid.   In particular, Broussard and Whitmer handpicked the three-person RFP Evaluation Committee to assure their desired outcome.   The Evaluation Committee included Wilkinson, but excluded certain other officials required by law to participate, such as persons with the technical expertise necessary to evaluate proposals.   Not surprisingly, the sham proposal evaluation process orchestrated by the River Birch co-conspirators was deeply flawed and corrupted.   In particular, no studies were done to compare the River Birch proposal to the existing Waste Management contract over a 25-year period.

60.    Notwithstanding the absence of any financial study, co-conspirators Wilkinson, Broussard, and Whitmer made statements to the Parish Council that the River Birch proposal would result in "substantial cost savings" to the Parish.   These statements were false and intentionally deceptive.

61.    In June, 2009, relying on the recommendation and false representations of Aaron Broussard, Tim Whitmer, and Tom Wilkinson, the Jefferson Parish Council awarded the landfill disposal contract to River Birch.   In doing so, the Parish effectively awarded an

exclusive contract to River Birch to dispose of all Parish waste in its landfill for the next 25 years.  The contract was worth approximately $160 million to River Birch.

62.    In addition to requiring that all Parish waste be disposed of at River Birch, in furtherance of their conspiracy to exclude competition and monopolize the waste disposal market, the River Birch Defendants and their co-conspirators sought specifically to eliminate Waste Management as a competitor.  In furtherance of this conspiracy, they drafted the River Birch contract to include a provision requiring that the Parish's current valid contract for waste disposal services with Waste Management be prematurely terminated as a condition to the River Birch contract becoming effective.

63.    Under the existing Jefferson Parish-Waste Management contract, commercial generators of municipal solid waste in the region had the option of disposing that waste at either the Jefferson Parish landfill or at the nearby River Birch landfill.  That existing competition between the landfills, however, would be eliminated if the Jefferson Parish landfill were closed, as required by the River Birch contract, and the commercial waste generators would be subject to the unregulated disposal rates at River Birch.

64.    After securing the contract for River Birch, Messrs. Broussard, Whitmer and Wilkinson attempted to effectuate the early termination of the Waste Management contract to operate the Jefferson Parish landfill and thereby transfer operations to River Birch.  These co-conspirators of River Birch engaged in specific acts of fraud, deception and other misconduct in an attempt to justify the early termination of the Waste Management contract. For example, Messrs. Broussard, Whitmer and Wilkinson, acting at the behest of their River Birch benefactors engaged in fraudulent and deceptive conduct as part of their effort to invoke a termination provision, known as the Annual Appropriation Dependency Clause, in the Parish contract with Waste Management.  In particular, shortly after approval of the River Birch contract and in connection with the 2010 Parish proposed budget, Mr. Whitmer improperly directed the Finance Director to "hide" the funds for the Waste Management contract in that proposed Parish Budget,

despite the existence of adequate funds for that purpose, by moving the funds from the landfill contract line item to the "Professional Services" line item.   By falsifying the Parish's budgetary submission, these co-conspirators sought to create the appearance of "insufficient funds" for continued operation of the Jefferson Parish landfill such as to trigger the early cancellation of the Waste Management contract and to commence the River Birch contract effective January 2010.   Upon information and belief, these co-conspirators intended to reallocate the hidden funds back to the disposal line item to fund the River Birch contract.

65.    In late 2010, the River Birch Defendants plans to abuse their influence with key members of the Jefferson Parish Administration began to fall apart.   First, the key assertion by Messrs. Broussard, Whitmer and Wilkinson that there would be "substantial cost savings" in the range of approximately $25 million by shifting waste disposal to River Birch were exposed as a complete sham and fraud.   These false statements were made specifically in an effort to deceive the Parish Council, the citizens of Jefferson Parish and to justify termination of the Waste Management contract prior to its natural term in order to provide a new exclusive contract to River Birch.

66.    In late 2010, it was revealed that the RFP process had been corrupted in the manner described above, and that there was no basis or studies to support any alleged "cost savings" that the Parish would realize from the River Birch contract as compared to the Waste Management contract.   Indeed, in early 2011, a report was issued by an independent consultant hired by Jefferson Parish that found that rather than "cost savings," Jefferson Parish would instead *lose* millions of dollars if it contracted with River Birch and closed its own landfill for 25 years.   Commercial waste generators not subject to the Jefferson Parish disposal contract would be expected to lose millions more through higher tipping charges.

67.    In addition to the series of highly irregular, illegal and deceptive actions against standard Parish policy and practice that cast doubt on the motivations of Messrs.

407344                                     - 19 -

Broussard, Whitmer and Wilkinson and the resulting legitimacy of the Jefferson Parish-River Birch contract, in 2010, it was reported that federal authorities were investigating the Jefferson Parish contract with River Birch. That investigation commenced after it became known that the wife of the Jefferson Parish Council aide, Tim Whitmer, had been awarded a large contract to provide insurance to Defendants Heebe and Ward for a number of their corporate entities, including Defendants' Shadowlake and River Birch LLC.

68.    Upon information and belief, the health insurance contract award by River Birch was a *quid pro quo* payment for the Jefferson Parish waste disposal contract. But for the corrupt influence and unlawful and undisclosed payments and financial benefits provided by River Birch, the Jefferson Parish Council would not have entered the 25-year contract with River Birch or sought to terminate their operating contract with Waste Management.

69.    Current Jefferson Parish Council members have publicly stated that they believe that they were misled regarding the River Birch contract and the undisclosed financial relationships at issue, and thus, have expressed the view that the contract be declared void and unenforceable.

70.    Since a federal investigation commenced of the River Birch Defendants the former Jefferson Parish Council President, Broussard, and key administrators, Whitmer, and Wilkinson, have all resigned their positions from Jefferson Parish government, and are reported to be targets of an ongoing federal criminal investigation.

71.    The acts of Defendants in improperly influencing Jefferson Parish Officials in connection with the exclusive contract secured by River Birch for waste disposal services in Jefferson Parish, including bribery, false statements, deception, and improper influence, were intended to deceive the Parish Council and the citizens of Jefferson Parish. These actions are continuing in nature.

## FRAUDULENT CONCEALMENT

72.     Defendants acted in a manner designed to actively conceal their participation in the anti-competitive and unlawful scheme described above.

73.     Defendants' bribes, for example, were by their very nature not disclosed to the public.  In many cases, Defendants acted through proxies, such as government officials illicitly paid for their services that were not known to be connected to the River Birch Defendants.  In fact, these public officials, although working on behalf of the River Birch Defendants, held themselves out as performing their public duties.

74.     Other persons that acted adverse to Waste Management and other River Birch competitors were only recently revealed to have been secretly retained as lobbyists by and on behalf of River Birch.

75.     Most, if not all, of the unlawful payments made to influence public officials to favor the River Birch Defendants, and disadvantage competing landfills, were made by entities associated with co-conspirator Shadowlake, but not directly by the River Birch Defendants.  Similarly, the phone banks, lawsuits, media broadcast payola, and other efforts to foster public opposition to Waste Management landfill activities were not conducted under the name of the River Birch Defendants, but rather, as bogus "grass-roots" community groups.

76.     The concealment of the River Birch Defendants' role in the conduct described above was part and parcel of the effectiveness of the conspiracy.  For example, even when questioned directly about Defendants' role in orchestrating the opposition campaign to the operation of the Chef Menteur and Old Gentilly C&D landfills, Henry Mouton lied to federal investigators about any connection between his conduct and the Defendants Ward, Heebe, or River Birch Inc.  Mouton claimed he had received over $450,000 in payments from the River Birch Defendants for "air conditioning" repair work.  In fact, Mr. Mouton faced a federal criminal charge for lying to federal investigators regarding his connection to the River Birch Defendants and their role in his efforts to

prevent the operations of the Chef Menteur and Old Gentilly landfills.  Other revelations have only recently come to light as a result of a federal raid by the FBI of the River Birch offices.

77.     Defendants also orchestrated their unlawful payments to Jefferson Parish officials in a manner designed to evade public knowledge.  No requirement to terminate the Waste Management contract or to close the Jefferson Parish landfill was included in the RFP.   Moreover, upon information and belief, the pay-offs to Jefferson Parish officials for the exclusive landfill contract were accomplished *via* a *quid pro quo* award of the Shadowlake insurance business to an agency connected with key Jefferson Parish employees.  Indeed, even other members of the Jefferson Parish council that awarded the 2010 disposal contract to River Birch have expressly stated that they were unaware of the financial connections and corrupting influence between River Birch Inc. and Jefferson Parish officials at the time of that contract and deceived about the alleged benefits of that contract at the time it was awarded.

78.     Until recently and despite the exercise of reasonable diligence, Waste Management did not know, and could not be expected to know in the exercise of reasonable diligence, of the River Birch Defendants' unlawful, anticompetitive, and in some cases, criminal conduct, taken in opposition to Waste Management's business interests.

## **RELEVANT MARKETS**

79.     The landfill disposal of C&D waste is a relevant product market.  C&D disposal is subject to regulation under Louisiana state law, and only those landfills permitted to accept C&D waste (Type I, II, and III)  may do so.

80.     The landfill disposal of municipal solid waste ("MSW") is a relevant product market.  MSW disposal is subject to regulation under Louisiana state law, and only those landfills permitted to accept MSW (Type I and II landfills) may do so.

81.    C&D landfills are not reasonably interchangeable with other landfills, such as Type I and II landfills that are capable of accepting industrial waste or MSW.  MSW may only be disposed of in a Type I or II landfill.   C&D landfills lack liners and other protections necessary to prevent leachates as would be required to dispose of MSW.

82.    Similarly, although C&D may be disposed of in a Type I or II landfill, typically, it would not be economical to do so.  Given the additional regulations, permits, and construction and operational requirements associated with Type I and II landfills, the disposal fees (or "tipping fees") associated with such waste disposal is significantly greater than that to dispose of C&D.  A ten percent increase in the price of disposal at a C&D landfill would not cause customers to dispose of C&D waste at an MSW landfill of equal distance.

83.    The United States Department of Justice has recognized landfills for the disposal of C&D and for the disposal of MSW as separate relevant products.  The LDEQ also tracks MSW landfills and C&D landfills separately and subjects them to different regulations.   Highlighting the differences between C&D landfills and MSW landfills, Defendants operate both a C&D Type III landfill (the "Highway 90" landfill) and an MSW Type II landfill ("River Birch") on adjacent parcels of land in Avondale, Louisiana.

84.    The greater New Orleans metropolitan area is a relevant geographic market for the disposal of C&D and MSW waste.  The New Orleans market consists of Orleans, Jefferson, Plaquemines and, St. Tammany parishes and the immediately surrounding areas.

85.    The transportation of C&D and MSW is bulky and expensive.  Moreover, landfills in Louisiana and surrounding states are extensively regulated, including with respect to the transportation or disposal of vegetation and woody waste from the Greater New Orleans Area ostensibly to prevent the spread of Formosa termite infestation, which would have included all of the Katrina related woody waste generated in the Greater New Orleans area.   Additionally, transfer stations, which would help reduce the

transportation costs to more distant landfills are prohibited.  As a result, landfills that are located at more distant locations were and are not realistic alternatives, and do not provide a meaningful constraint on the pricing of New Orleans area landfills.  Moreover, many landfills in other parts of Louisiana are publicly-owned and do not accept waste from outside their Parish.  The United States Department of Justice has recognized that markets for landfill disposal are typically limited to those in or surrounding a metropolitan statistical area.

86.     Entry into the markets for C&D landfill disposal (Type III landfills) and for MSW landfill disposal (Type I or II) in the greater New Orleans area is difficult and time consuming.  The landfill siting and permitting process is political in nature and heavily regulated, and thus, it is frequently the subject of organized opposition and litigation.  It would take many years to find suitable land, obtain the necessary permits, and construct a new landfill.  This process takes substantially longer than two years.

## CAUSES OF ACTION

## COUNT I:  VIOLATION OF RICO SECTION 1962(C)

87.     Waste Management of Louisiana LLC hereby incorporates its allegations from paragraphs 1 through 86, above, as if set forth herein.

88.     Bribery of public officials is a specifically enumerated predicate act under civil RICO.   As outlined above, and in the indictment of Henry Mouton, Defendants associated with River Birch Inc. and Messrs. Heebe and Ward, have paid or arranged bribes of public officials over a period of many years, starting at least as early as 2005.

89.     Henry Mouton alone was indicted for accepting more than 100 separate illegal and undisclosed payments from Defendants worth more than $450,000 over a period of several years.   Upon information and belief, other public officials who have received improper and undisclosed *quid pro quo* payments include at least Jefferson Parish

officials Messrs. Broussard, Whitmer, and Wilkinson.  In each case, the illicit payments were made for the purpose of allowing the River Birch Defendants to dominate the greater New Orleans landfill disposal markets by limiting competition.

90.     Defendants Ward, Heebe, and River Birch utilized other legal entities that they owned or controlled under the umbrella of Shadowlake to implement their unlawful scheme and to make the unlawful bribes to these public officials.  Upon information and belief, Defendants utilized multiple, separate legal entities operating under the Shadowlake umbrella, including the companies known as "W. Inc.", "W.C.S. Inc.," "D.A." and "A.P. LLC."

91.     Defendants' corrupt and unlawful conduct was targeted, in part, at Waste Management.  The express and admitted purpose of the bribes paid by or on behalf of Defendants was to limit competition from other landfills, including but not limited to those owned and/or operated by Waste Management, and to unfairly advantage and enrich the River Birch and Highway 90 landfills.

92.     As a result of Defendants unlawful conduct as set forth above, Plaintiff has suffered financial injury, including lost profits associated with the operations of their landfills, and made unnecessary expenditures in connection with baseless and improper legal challenges set in motion by Defendants.

## COUNT II:  VIOLATION OF RICO SECTION 1962(D)

93.     Waste Management of Louisiana LLC incorporates the allegations in paragraphs 1 through 92, above, as if set forth herein.

94.     Bribery of public officials is a specifically enumerated predicate act under civil RICO.   As outlined above and in the indictment of Henry Mouton, Defendants associated with River Birch, Inc. and Messrs. Heebe and Ward were part of a long-running conspiracy to improperly influence and corrupt the political process for their own economic advantage.  This conspiracy resulted in the payment of numerous bribes and

illicit payments to public officials over a period of many years. In each case, the illicit payments were made for the purpose of allowing the River Birch Defendants to dominate the greater New Orleans landfill disposal markets by limiting competition.

95.     Henry Mouton has plead guilty to charges that he was part of an unlawful conspiracy whose express purpose was to limit competition to Defendants' landfills. Upon information and belief, other public officials who have received improper and undisclosed quid pro quo payments from Defendants or their co-conspirators include at least Jefferson Parish officials, Messrs. Broussard, Whitmer and Wilkinson. In each case, the Defendants and each of the co-conspirators, known and unknown, understood and took acts in furtherance of the River Birch Defendants' goals.

96.     Defendants Ward, Heebe, and River Birch utilized other legal entities that they owned or controlled under the umbrella of Shadowlake to implement their unlawful scheme and to make the unlawful bribes to these public officials. Upon information and belief, Defendants utilized multiple, separate legal entities operating under the Shadowlake umbrella, including the companies known as "W. Inc.", "W.C.S. Inc.," "D.A." and "A.P. LLC."

97.     Defendants' corrupt and unlawful conduct was targeted, in part, at Waste Management and designed and intended to limit competition from landfills owned and operated by Waste Management capable of serving the greater New Orleans market.

98.     As a result of Defendants unlawful conduct and conspiracy to engage in such conduct, as set forth above, Plaintiff has suffered financial injury including lost profits associated with the operations of their landfills, and made unnecessary expenditures in connection with baseless and improper legal challenges set in motion by Defendants.

## COUNT III:  VIOLATION OF LOUISIANA UNFAIR AND DECEPTIVE PRACTICES ACT

99.    Waste Management of Louisiana LLC incorporates the allegations in paragraphs 1 through 98, above, as if set forth herein.

100.    Defendants have committed a series of unfair and deceptive trade practices, including payment of bribes and improper and undisclosed benefits to public officials in order to inflict harm on Waste Management and to obtain improper benefits for Defendants.   Defendants have also made numerous false statements about Waste Management and other rivals, and sponsored, caused, or engaged in objectively baseless litigation and adjudicatory challenges for the purpose of delaying competition. Defendants' conduct is unethical and unscrupulous.

101.    Waste Management is a competitor of Defendants' River Birch and Highway 90 landfills.   Defendants' corrupt and unlawful conduct was targeted, in part, at Waste Management and was designed and intended to limit competition from landfills owned and/or operated by Waste Management capable of servicing the greater New Orleans area.

102.    Defendants' conduct has negatively impacted the consumers of landfill disposal services in the greater New Orleans area, including but not limited to FEMA and the LDEQ.

103.    As a result of Defendants unlawful conduct as set forth above, Plaintiff has suffered financial injury including lost profits associated with the operations of their landfills, and made unnecessary expenditures in connection with baseless and improper legal challenges set in motion by Defendants.  These injuries continue to this day.

## COUNT IV:  VIOLATION OF LOUISIANA ANTITRUST LAWS
## ATTEMPT TO MONOPOLIZE

### (C&D LANDFILLS)

104.   Waste Management of Louisiana LLC incorporates the allegations in paragraphs 1 through 103, above, as if set forth herein.

105.   Defendants have attempted to monopolize the C&D landfill disposal market for the greater New Orleans area.

106.   Defendant Highway 90 possesses substantial market power in the C&D landfill disposal market for greater New Orleans.  According to the LDEQ, Defendants' own and operate one of the few permitted C&D landfills serving the greater New Orleans area. That landfill contains the greatest permitted size and has the greatest remaining capacity.  During the period in question for post-Katrina debris clean-up, the principal competition for the Highway 90 landfill came from the Chef Menteur and Old Gentilly landfills in east New Orleans.

107.   As outlined above, including through the corrupt and unlawful conspiracy and actions of the River Birch Defendants and co-conspirator Henry Mouton, Defendants sought to place unreasonable restraints and conditions on the operation of the Chef Menteur and Old Gentilly landfills with the goal of closing same.  By late 2006, Defendants had succeeded in closing the Chef Menteur landfill.

108.   Defendants' conduct has restricted choice and negatively impacted the consumers of C&D landfill disposal services in the greater New Orleans area, including those services purchased post-Katrina by FEMA.

109.   As a result of the River Birch Defendants unlawful conduct as set forth above, Plaintiff has suffered financial injury including lost profits associated with the operations of their landfills, and unnecessary expenditures made in connection with the numerous improper legal challenges set in motion by Defendants.

**COUNT V:  VIOLATION OF LOUISIANA ANTITRUST LAWS
ATTEMPT TO MONOPOLIZE**

**(MSW LANDFILLS)**

110.    Waste Management of Louisiana LLC incorporates the allegations in paragraphs 1 through 109, above, as if set forth herein.

111.    Defendants have attempted to monopolize the MSW landfill disposal market for the greater New Orleans area.

112.    Defendant River Birch possesses substantial market power in the MSW landfill disposal market for greater New Orleans.  According to the LDEQ, Defendants' own and operate one of the few permitted MSW landfills serving the greater New Orleans area and the only privately-owned landfill in that region.  The River Birch landfill disposes of more MSW and commercial waste than any landfill serving New Orleans by an order of magnitude.  The River Birch landfill also contains the greatest remaining capacity of any Type I or II landfill in the entire state.

113.    During the period in question, the River Birch landfill competed with Jefferson Parish landfill for MSW disposal from areas within Jefferson Parish, and for commercial generators in Jefferson Parish and surrounding areas.

114.    As outlined above, including through the corrupt and unlawful actions of the River Birch Defendants and their co-conspirators, known and unknown, entered an illegally-obtained contract with Jefferson Parish that would require Jefferson Parish to close its own landfill currently operated by Waste Management and eliminate competition from that landfill.

115.    Defendants' conduct has restricted choice and negatively impacted the consumers of MSW landfill disposal services in the greater New Orleans area.

116.    As a result of Defendants unlawful conduct as set forth above, Plaintiff has suffered financial injury including lost profits associated with the operations of their

landfills, and unnecessary expenditures made in connection with the numerous improper legal challenges set in motion by Defendants.

**COUNT VI:  VIOLATION OF LOUISIANA ANTITRUST LAWS**
**CONSPIRACY TO MONOPOLIZE**

**(C&D AND MSW LANDFILLS)**

117.   Waste Management of Louisiana LLC incorporates the allegations in paragraphs 1 through 116, above, as if set forth herein.

118.   Defendants have conspired to monopolize the C&D landfill disposal market and the MSW landfill disposal market for the greater New Orleans area.

119.   Defendants River Birch and Highway 90 possess substantial market power in the C&D and MSW landfill disposal markets for greater New Orleans.

120.   During the period from 2006 to present, the River Birch Defendants have conspired with others, including state and local political figures, known and unknown, to take unlawful and anticompetitive actions designed and intended to disrupt, disadvantage, and eliminate competing C&D and MSW landfills serving or capable of serving the greater New Orleans area.  Landfills targeted for anticompetitive acts include the Chef Menteur, Old Gentilly, and Jefferson Parish landfills.  River Birch Defendants may also have targeted Waste Management's Central and Woodside landfills to prevent them from serving as disposal facilities for the greater New Orleans area.

121.   Defendants' conduct has restricted choice and negatively impacted the consumers of C&D and MSW landfill disposal services in the greater New Orleans area.

122.   As a result of Defendants unlawful conduct as set forth above, Plaintiff has suffered financial injury including lost profits associated with the operations of their landfills, and unnecessary expenditures made in connection with the numerous improper legal challenges set in motion by Defendants corrupt activities.

## COUNT VII:  CIVIL CONSPIRACY
## (LA. CIVIL CODE ART. 2324)

123.    Waste Management of Louisiana LLC incorporates the allegations in paragraphs 1 through 122, above, as if set forth herein.

124.    In taking the actions outlined above, the River Birch Defendants have conspired with each other and with other entities, known and unknown, including, but not limited to. former public officials of Louisiana and Jefferson Parish, to commit intentional acts of unfair competition directed against Waste Management and other competing landfill operators.

125.    Plaintiff has suffered injury to their business and property as a result of the unlawful, tortious and wrongful actions perpetrated by the conspiracy orchestrated by the River Birch Defendants.

## PRAYER FOR RELIEF AND JURY DEMAND

Wherefore, Waste Management of Louisiana LLC requests a trial by jury and seeks the following equitable, injunctive, and compensatory relief:

1.  An award of compensatory damages, subject to trebling under RICO, in an amount to be established at trial, but in all accounts, in excess of $ 50,000,000.

2.  An award of punitive damages due to Defendants' repeated series of intentional, reckless, tortious and unlawful conduct targeting Waste Management's operations and taken in reckless disregard for its impact on the post-Katrina cleanup effort.

3.  An award of attorney's fees and costs of bringing this action.

4.  Such other relief and equitable remedies as this Court deems reasonable and appropriate.

Respectfully submitted,


/s/ Patrick A. Talley, Jr.
Patrick A. Talley, Jr. (#1616)
Miles P. Clements (#4184)
Benjamin M. Castoriano (#31093)
Heather McArthur (#32897)
FRILOT L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, LA 70163
Tel: (504) 599-8000
Fax: (504) 599-8100
ptalley@frilot.com; mclements@frilot.com;
bcastoriano@frilot.com
hmcarthur@frilot.com

OF COUNSEL
James G. Kress (motion for pro hac vice
admission to be filed)
Erik T. Koons (motion for pro hac vice
admission to be filed)
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004
Tel:  (202) 639-7884
Fax:  (202) 639-1159

**Attorneys for Plaintiff,**
**Waste Management of Louisiana, LLC**