UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WASTE MANAGEMENT OF LOUISIANA, LLC | * * * | CIVIL ACTION |
| | * | NO. 2:11-cv-02405 |
| VERSUS | * * | |
| | * | JUDGE CARL J. BARBIER |
| RIVER BIRCH, INC., HIGHWAY 90, LLC, FREDERICK R. HEEBE and ALBERT J. WARD, JR. | * * * * | MAGISTRATE KAREN WELLS ROBY |
| * * * * * * * | | |

**OBJECTIONS TO PLAINTIFF'S DEMONSTRATIVE EVIDENCE**

Defendants, River Birch, LLC f/k/a River Birch, Inc., Highway 90, LLC, Frederick R. Heebe, and Albert J. Ward, Jr. (the "Defendants"), respectfully submit the following objections to Waste Management's demonstrative exhibits, provided at 11:32 p.m. last night.[1]

### I.   Argument

*A.   Jury Charges Are Not Appropriate Demonstrative Evidence*

Defendants object to the use of Slides 35-36 on the grounds that they contain proposed jury instructions not yet approved by the Court and objected to by Defendants. For the reasons discussed at length in Defendants' objections to Waste Management's proposed instructions, the content of Slides 35-36 misstates the law and is extremely likely to lead to jury confusion regarding what may constitute a predicate act. *See* Rec. Doc. 601 at 3-5. Defendants further object to Slides 35-36 as misleading because the language used paraphrases and does not directly quote the relevant statutes.

---

[1] Defendants are filing under seal the demonstratives produced to them last night, labeled as Exhibits 1 and 2. The individual Slides have been hand numbered consecutively for the convenience of the court and ease of reference.

Moreover, "it is not proper for an attorney to instruct the jury as to what the law is. That is the province of the Court." *Walker v. Williamson*, No. 14-cv-381, 2017 WL 1397957, at *2. *See also Willette v. Finn*, 778 F. Supp. 10, 11 (E.D. La. 1991) (explaining that "[i]t is the province of the court to instruct the jury as to the principles of law affecting the case" and counsel is prohibited from presenting interpretations of the law) (internal quotations and citation omitted)); *Carr v. Montgomery Cty.*, Tex., No. 13-cv-2795, 2015 WL 5838862, at *8 (S.D. Tex. Oct. 7, 2015) ("It is the province of the judge, not an expert, to instruct the jury on the legal standards applicable to the case."). To allow Waste Management to present its misstatements of the law would improperly usurp the role of the Court and thus, provides an additional reason to preclude Waste Management's use of Slides 35-36 or their presentation to the jury.

### B. Waste Management's Slides Regarding Purported Shell Companies Include Entities Not at Issue in this Case

Included in this category are Slides 10, 38, 39, 40, 52, 79, 81 and 95. Slide 10, entitled "*River Birch's Web of Shell Companies or "Straw Man Entities*" contains references to 3 entities (Ring Associates, Water Front Properties, and Pasture Land)[2] which made no payments to Mouton (according to Slide 61) and whose only prior relevance was to claims related to Jefferson Parish. The Jefferson Parish claims were settled and excised from the case. These entities are irrelevant and barred because they were identified by Waste Management in its discovery responses as entities that made campaign contributions to candidates in *Jefferson Parish*. Pursuant to the parties' settlement agreement, Waste Management is *not* permitted to advance any claims or use any evidence related to the Jefferson Parish claims (which included claims of campaign contributions to Jefferson Parish politicians such as Aaron Broussard) in any way whatsoever (such

---

[2] Ring Associates and Pasture Land are also accused of making contributions to Jindal's campaign in 2007. For reasons set forth in Section G below, these contributions should also be excluded. Neither entity is identified on Slide 61 as an entity which made payments to Mouton.

as, for example, to prove intent, motive, or *modus operandi*).[3] To allow Waste Management to introduce irrelevant documents related to companies that did *not* contribute to Mayor Nagin's campaign or make payments to Mouton but rather formed part of the dismissed Jefferson Parish claim would be prejudicial, improper, and runs afoul of the parties' settlement agreement.

### C. *Misrepresentation of Mouton's Position and Payments*

Slides 53, 61 through 78 are all entitled "*Defendants' Payments to Mouton as LDWF Commissioner*". Each Slide repeats the original chart and captions found on Slide 61, representing, improperly, that Henry Mouton was a member and Commissioner of the Louisiana Department of Wildlife and Fisheries ("LDWF"). He was not. The LDWF was created in 1975. Henry Mouton was a member of the Louisiana Wildlife and Fisheries Commission (LWFC). That is an entirely different juridical entity, created in the 1974 constitution. This information is publicly available on the LDWF website. For that reason, the caption referring to Mouton as *LDWF Commissioner* is incorrect and the use of the LDWF logo is improper. All such references, including the use of the LDWF's logo, in Slides 61 through 78 should be stricken.

Additionally, the chart of purported "payments" includes invoices as individual items that presumably correspond with certain payments listed. Including both the invoices and the payments makes it appear that there were more payments than were actually made. As a result, the title of these slides is misleading, and will have the tendency to confuse the jury and prejudice the defendants. These charts should be excluded, or in the alternative, revised to reflect payments only.

---

[3] The confidential settlement agreement excising the Jefferson Parish claims, ¶¶ 3-4, was filed under seal as Exhibit 2 to defendants' objections to plaintiff's exhibits, Rec. No. 582.

### D. Inclusion of Exhibits subject to Objections

Despite the Court's instruction at the June 1, 2021 Pretrial Conference that demonstratives used in opening statements cannot include objected to exhibits, Waste Management has included numerous exhibits which remain on their objected to list, even after the defendants removed approximately 120 of their objections to Waste Management's exhibits. To the extent Waste Management contemplates using any of the demonstratives it produced in its opening, that would be improper.[4] Included in this category of slides are the following:

> Slide 20 – Objected Exhibit (PL 178)
> Slide 21 – Objected Exhibit (PL 185)
> Slide 22 – Objected Exhibit (PL 208)
> Slide 23 – Objected Exhibit (PL 220)
> Slide 25 – Objected Exhibit (PL 243)
> Slide 26 – Objected Exhibit (PL 255)
> Slide 27 – Objected Exhibit (PL 274)
> Slide 29 – Objected Exhibit (PL 283)
> Slide 33 – Objected Exhibit (PL 368)
> Slide 34 – Objected Exhibit (PL 375)
> Slide 54 – Objected Exhibit (PL 119)
> Slide 55 – Objected Exhibit (PL 165)[5]
> Slide 56 – Objected Exhibit (PL 145)
> Slide 58 – Objected Exhibit (PL 178)
> Slide 63 – Objected Exhibit (PL 79, p.3)
> Slide 64 – Objected Exhibit (PL 90)
> Slide 65 –Objected Exhibit (PL 13-17[6]
> Slide 66 – Objected Exhibit (PL 119)
> Slide 67 – Objected Exhibit (PL 145)
> Slide 68 – Objected Exhibit (PL 159)
> Slide 69 –Objected Exhibit (PL 165)[7]
> Slide 70 – Objected Exhibits (PL 218 and PL 22, p.3)
> Slide 71 – Objected Exhibits (PL 220 and PL 22, p.3-4)
> Slide 73 – Objected Exhibits (PL 231 and PL 22, p.6)
> Slide 74 – Objected Exhibits (PL 22, p.9)[8]

---

[4] Defendants requested and Waste Management produced the support for Waste Management summary documents, including this slide. That information reveals that the vast majority of the referenced documents are listed as "objected to" exhibits.

[5] Please note that the Exhibit on the left of the slide is objected to but the check on the right is Joint Exhibit 285

[6] Please note that the Exhibit on the right of the slide is objected to but the excerpt on the left is Joint Exhibit 234.

[7] *Id.*

[8] Defendants are unable to locate the document supporting the first "call out" beginning "write to me for $600" on this slide.

>Slide 75 – Objected Exhibits (PL 294 and PL 22, p.10)
>Slide 76 – Objected Exhibits (PL 324 and PL 22, p.3)
>Slide 77 – Objected Exhibits (PL 370 and PL 371)
>Slide 78 – Objected Exhibits (PL 22, p.14)

Waste Management should not be allowed to use any of these slides until each objected to document is ruled admissible, if ever.

### E. *Google Earth Photos and Video Not Identified in Pretrial Order*

Additionally, Defendants object to the use of Slides 1 through 8 of Waste Management's demonstratives, as well as a nine-minute aerial video of the Chef Menteur site on the grounds that neither the images nor the video were produced previously or listed as exhibits for trial. Because these purported demonstratives have not and will not be properly authenticated[9] and were not timely disclosed,[10] their use is improper. Joint Exhibit 3 contains eight GoogleEarth images, which Waste Management is of course free to use, but the additional untimely exhibits masked as "demonstratives" should be precluded. Additionally, the nine-minute aerial video is neither time nor date stamped, but presumably was taken recently—approximately 15 years after the relevant time period. It is, therefore, not relevant to any issue in this case, a waste of time, and also excludable on this basis.

### F. *Slides Referencing Alleged Communications Between Mouton and Defendants*

Slides 11-34 are captioned, "*Mouton's Communications with Defendants*". Slide 11, a chart of the communications set forth separately in Slides 12-34, is misleading in that not all communications referenced were between Mouton and Defendants. For example, Slide 15 is an

---

[9] Photographs, like any other form of tangible evidence, must be authenticated to be admitted at trial. Federal Rule of Evidence 901 requires the proponent to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Of course, a photograph may be authenticated by someone other than the photographer if that person "recognizes and identifies the object depicted and testifies that the photograph fairly and correctly represents it." *United States v. Clayton,* 643 F.2d 1071, 1074 (5th Cir. 1981).
[10] Pursuant to the Court's November 20, 2019 Scheduling Order, the parties had to identify all new exhibits by July 1, 2020 (Rec. Doc. 466).

email between Mouton and Garret Graves copied to Kyle Ruckert. Likewise, Slide 16 includes another Mouton/Graves/Ruckert email, copied to Courtney Guastella and David Vitter. The defendants were not copied on this email. Also included in this category are Slides 21, 22 (an email to and from Mouton, with no one else copied) and 27 (an email from Mouton to Ann Taylor).[11]

### G. Slides Referencing Governor Bobby Jindal, Congressman Wayne Gilchrest, U.S. Attorney David Dugas, and U.S. Attorney Don Washington

In Slides 38-52, 55 and 56, Waste Management suggests that the defendants bribed or conspired with former Governor Bobby Jindal, former Maryland Congressman Wayne Gilchrest, former U.S. Attorney David Dugas, and former U.S. Attorney Donald Washington. Slides 38-52 detail campaign contributions to Governor Jindal, Slide 55 states that the defendants paid Mouton to "meet with political figures in D.C.," and Slide 56 states that the defendants "paid Mouton for access to U.S. Attorneys for Districts in Louisiana." These demonstratives are improper.

None of these individuals are mentioned anywhere in the pretrial order. As a contested issue of fact, Waste Management included in the pretrial order: "Whether Defendants bribed Ray Nagin or any other public officials" and "Whether Defendants conspired with Henry Mouton or any other public officials to close or prevent permitting and operation of rival landfills." Waste Management did not identify Jindal, Gilchrest, Dugas, or Washington, and such "catchall" provisions are inadequate to preserve claims for trial. Accordingly, Waste Management has waived any claims alleging bribery of or a conspiracy with Jindal, Gilchrest, Dugas, or Washington and should be precluded from presenting these demonstrative exhibits.

---

[11] Furthermore, Waste Management has not yet shown that many of these documents were actually reviewed by the defendants.

"It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial" and "if a claim or issue is omitted from the final pretrial order, it may be waived, even if it appeared in the complaint." *Martin v. Lee*, 378 Fed.Appx. 393, 395 (5th Cir. 2010).  In addition, the Fifth Circuit has long encouraged district courts "to construe pre-trial orders narrowly without fear of reversal," and this Court should do so here.  *Elliott v. Harris*, 205 Fed. Appx. 255, 257 (5th Cir. 2006) (citing *Flannery v. Carroll*, 676 F.2d 126, 129 (5th Cir. 1982)).

Here, Waste Management failed to identify Jindal, Gilchrest, or Dugas anywhere in the pretrial order, and instead simply claimed that the defendants bribed or conspired with "any other public officials."  Such a "catchall provision is insufficient to preserve a specific claim." *Spectrum Commc'n Specialists, LLC v. KMJ Servs., Inc.*, 2012 WL 138942, at *4 (E.D. La. Jan. 18, 2012). *See also Flannery*, 676 F.2d at 130 (affirming district court's decision that a claim was not preserved "despite the slight reference to it").

Further, in Slide 55, Waste Management has identified Congressman Gilchrist as Chairman of the Subcommittee on Fisheries, Wildlife, and Oceans. There is no document or evidence to support this assertion.

### H.  *Inaccurate and Prejudicial Information regarding the Nagin Contributions.*

Slides 80, 81, 93 and 94 contain inaccurate and prejudicial information regarding the Nagin contributions. No one disputes that certain entities associated with the defendants contributed to the Ray Nagin Campaign Fund in May 2006. Four entities did so by check; each such check was in the amount of $5,000. The checks were reported on the campaign's public filings. Slides 80, 81, 93, and 94 badly distort these facts in the following ways.

The slides misstate the recipient of the contribution, identifying "Mayor Nagin" as the beneficiary and disregarding what the checks themselves reveal. The campaign contributions were made to the "Ray Nagin Campaign Fund," not Mayor Nagin personally, as the slides state. In that way, they twist the facts to suggest bribery. As bribery is the sole predicate act alleged in the complaint, these distortions threaten severe prejudice.

The slides characterize the contributions as "[p]ayment to Mayor Nagin," thus reinforcing the same false idea. No one disputes that these were, instead, contributions to the mayor's campaign fund, a nonprofit corporation. They were not *payments* to anyone—much less to the mayor himself. And there is no evidence or even allegation that the Nagin campaign misused these contributions or funneled them to the mayor for his personal use.

And finally, the slides depict pictures of bundles of cash each time a contribution is mentioned, thus implying some back-room pay-off or suitcase of cash instead of a campaign contribution to a fund—never the mayor personally. Waste Management's own exhibits (and some of its demonstratives) prove the falsity of the suggestion that the defendants delivered *cash* to the mayor. They gave *checks* to his campaign fund. Implying otherwise is inexcusable and unfair. The Court should prohibit the use of these false and misleading demonstrative exhibits.

### I. Disguised Expert Opinion by Chuck Carr Brown

Slides 82, 83, and 84 contain improper opinion testimony unsupported by expert reports. The Court recently informed the parties that persons with technical expertise, but who did not submit expert reports, will be limited to testifying about what they saw or observed.[12] Opinions on issues beyond the knowledge of the average layperson will be inadmissible. While the issue arose

---

[12] June 11, 2021 hearing transcript, p. 19 (observing that prospective testimony crosses the line from factual to expert when "[a]n average lay person wouldn't know that, would they?"); *id.* at p. 20 (indicating that the Court would exclude testimony that is "based on . . . expert experience [where it is] not a lay person observing something").

8

in the context of Wilma Subra, a scientist and environmental advocate, the rule applies equally to Waste Management's witnesses. Slides 82, 83, and 84 recite opinions and estimates of the quantity of debris generated by Hurricane Katrina that have been espoused by Chuck Carr Brown, who was then an Assistant Secretary of the DEQ. Dr. Brown, who has a Ph.D. in public administration, likely did not create these estimates himself. And even if he did, the estimated total quantity of hurricane debris after the storm is a matter of technical, engineering opinion outside the ability of any lay person to address. Likewise, whether that debris could have filled the Superdome 40 times over, as slide 83 states, is a technical estimate or opinion unsupported by any expert report. If someone performed the complicated analysis to support this estimate, that would be expert testimony. If no one did, then it is a speculative guess. Either way, it is inadmissible.

### J.  Two Rivers landfill and Kilona

Slide 88 is improper because it depicts a map with various landfill sites, including the "Two Rivers Landfill" and represents that the map depicts "Landfill Alternatives for Katrina Debris." One of those sites on the map is the never-built Two Rivers landfill in Catahoula, Parish. But the DEQ never permitted that site to operate, finding both before Chef Menteur opened and after Chef Menteur closed that Two Rivers was unnecessary because there were "adequate numbers of debris management sites within the hurricane affected areas to handle the waste."[13] Additionally, the Kilona Ventures landfill was "too far away" (Brown depo, taken 3/8/17 pg. 120, lines 17-20). As such, this slide should be excluded as misleading.

---

[13] Trial Exhibit 217, November 28, 2005 letter from Chuck Carr Brown to Two Rivers Recycling (EDLA.11-2405_RiverBirch 009334); *see also* Defendants' Exhibit 76, March 2007 internal Waste Management email (attaching news article in which DEQ spokesman states that DEQ rejected proposed Two Rivers landfill because "it just isn't needed") (internal quotation marks omitted)).

### K. *Misleading Slide as to Period and Types of Damages Claimed*

Slides 37 and 89 present a new theory of damages and misstate the period in which, but-for the alleged misconduct, the landfill might have remained open. As Waste Management confirmed in its case statement filed just the other day, it seeks as damages the profits it allegedly would have made had its landfill remained in operation another 110 days.[14] That period corresponds to the declaration of emergency within the City of New Orleans. The parties' expert accountants debate what those profits would have been. Waste Management's expert pegs them at $4,121,058.[15] But in slides 37 and 89, Waste Management injects a new, larger number—$8 million—and plans to tell the jury that there were "Millions Lost in Investment." Waste Management refers to this as its "hard costs." These alleged costs are independent of the lost profit calculation of its accounting expert, Ronald Gagnet. The reference to lost investment and hard costs is improper for several reasons.

First, Waste Management's Rule 30(b)(6) witness on damages testified that Waste Management is not seeking its hard costs as damages.[16] Regardless of whether it might have pursued a rescission model of damages, restoring the status quo ante, Waste Management chose to pursue lost profits. Having conceded in 2017 that it was not seeking hard costs as damages, Waste Management may not reverse course now. And should Waste Management say that it does not seek those costs as damages, but offers them only for context, that would be unpersuasive. The

---

[14] Rec. Doc. 612, p. 2 ("Waste Management seeks damages in this case for the profits it would have earned at the Chef Menteur landfill if it had been allowed to remain open for the duration of the declaration of emergency in the City of New Orleans.").
[15] Amended expert report of Ronald L. Gagnet, p. 8.
[16] Waste Management corporate representative (Ronnie Griffing) dep., pp. 8-9, 41 ("("[M]y first question is whether Waste Management contends that the total hard costs on page 9 [of the expert report] are damages that it is seeking to recover in this case? A. . . . I don't believe at this time it's part of the damages we're seeking.").

idea that a plaintiff can tell the jury that it spent $8 million on a project and not expect it to influence or confuse the jury's perception of the case is implausible.

Second, Waste Management benefitted from that investment. Its own documents show, for example, that the heavy machinery it bought for the Chef Menteur landfill found use at other company facilities.[17] And since Waste Management bought the Chef Menteur site, it still owns the property.[18] No one contends it is worthless. Yet Waste Management's hard costs slide gives the impression that the company lost $8 million. That is not accurate.

Third, Waste Management used its investment to gross millions of dollars between April and August 2006. At a minimum, even had the parties' experts gone down this road, Waste Management would have to deduct the revenue it actually made. But no one has done this work because Waste Management disclaimed this theory years ago. In suggesting that it lost "millions" in "investment," Waste Management gives a false impression.

And finally, causation is absent. It may be that Waste Management invested in the landfill expecting to be able to operate it for years—as long as there was debris on the curbs of city streets—without ever obtaining a conditional use permit. If it thought that, it was wrong. The Court confirmed that the damages period ends on December 2, 2006.[19] That is when the landfill had to close or secure a conditional use permit. In other words, the mayor could not have exempted Waste Management from the zoning laws for years. Beyond December 2, nothing the defendants allegedly did cost Waste Management one dollar.[20] Thus, the proximate cause of Waste

---

[17] *Id.* at p. 203 ("Q. I mean the equipment that you had on site on Chef Menteur that could be redeployed was redeployed, correct? A. It was redeployed, yes.").
[18] *Id.* at p. 41 ("Q. . . . Does Waste Management still own the land on which this landfill sat? A. Yes, we still have the property.").
[19] Rec. Doc. 523, pp. 8-9.
[20] As Waste Management acknowledged, "[t]hose few months between the Chef Menteur landfill's opening and its closing are the central focus of this case." Rec. Doc. 612, p. 2.

Management's investment decision was its misunderstanding of the emergency powers of the mayor. Its Rule 30(b)(6) witness claimed not to have known of Mayor Nagin's executive order limiting the zoning exemption to six months.[21] He didn't know that the mayor had issued an emergency proclamation, didn't know the extent of the mayor's emergency powers, and didn't know what would happen to the landfill when the local emergency ended.[22] He thought that the DEQ's emergency order, or the Governor's, or both, allowed Waste Management to avoid the City Planning Commission and City Council for years. Those basic misunderstandings are what caused Waste Management to invest in the landfill.

Slide 37 contains these errors and more. The slide presents a timeline entitled "Expected vs Actual Time Span for Chef Menteur Operation." The Court should exclude it for the following reasons.

Telling the jury that the "expected time span" for the landfill extended through the second half of 2007 is simply wrong and conflicts with the Court's May 20, 2020 order setting December 2, 2006, as the last day Chef Menteur could conceivably operate without a conditional use permit.[23] Giving the jury a second "expected" period will confuse them about the supposed consequences of the defendants' alleged actions.

Additionally, the slide coins a new term—the "duration of the cleanup emergency"—which only adds to the confusion. The relevant emergency period, as the Court has confirmed, is the

---

[21] Waste Management corporate representative (Timothy Hawkins) dep., p. 37 ("A. We wanted to discuss the continuation and the ongoing operation of the Chef Menteur Landfill, unaware that the [executive] Order existed.").

[22] *Id.* at p. 77 ("Q. Are you aware that the Mayor of the City of New Orleans issued various emergency proclamations? A. No, but I'm sure he did."); pp. 79-80 ("Q. Do you know what the limits of the Mayor's power are with regard to suspending zoning laws in the City of New Orleans? A. No, not specifically. Q. Do you know generally? A. No."); pp. 81-82 ("Q. What was your understanding about the termination of the Mayor's state of emergency . . . how that would affect the Chef Menteur Landfill? . . . A. I don't know.") (omitting form objections).

[23] Rec. Doc. 523, pp. 8-9.

duration of the mayoral declaration of emergency. That period ended on December 2, 2006, and the mayor lost all power to suspend the Comprehensive Zoning Ordinance after that. Telling the jury of some other "clean up emergency" is misleading. Recall that several government agencies issued emergency declarations. None of them matters for purposes of damages. Only the mayor's declaration empowered the mayor to give a zoning exemption.

The slide also refers to a period during which the U.S. Army Corps of Engineers had a "curbside debris mission." That ostensibly lasted unto the latter part of 2007. The injection of yet another time period is improper, irrelevant, and confusing.

The slide suggests that the "Period of Governmental and Regulatory Approvals" began in November 2005 and ended by April 2006. That is false and misleading. The need for governmental approval extended well beyond that. Waste Management needed a conditional use permit, and it belatedly applied for one in August 2006—after the six-month order expired—and then abandoned its own application months later. And finally, Slide 37 restates the $8 million hard costs figure meant to prejudice the defendants and make it appear as though Mr. Gagnet's $4,121,058 is a bargain. It is improper for the reasons cited above.

## II. Conclusion

For the foregoing reasons, the defendants' objections should be sustained.

Respectfully submitted,

 /s/ Thomas M. Flanagan
Thomas M. Flanagan (#19569)
Camille E. Gauthier (#34558)
**FLANAGAN PARTNERS LLP**
201 St. Charles Avenue, Suite 3300
New Orleans, Louisiana 70170
Telephone: (504) 569-0235
tflanagan@flanaganpartners.com

*Attorneys for Defendants, River Birch, LLC f/k/a River Birch, Inc. and Highway 90, LLC*

 /s/ William P. Gibbens
Kyle Schonekas (#11817)
William P. Gibbens (#27225)
Joelle F. Evans (#23730)
**SCHONEKAS, EVANS,
McGOEY & McEACHIN, L.L.C.**
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
Telephone: (504) 680-6050
billy@semmlaw.com

*Attorneys for Defendant, Frederick R. Heebe*

 /s/ Robert A. Kutcher
ROBERT A. KUTCHER (#7895)
NICOLE S. TYGIER (#19814)
*KUTCHER TYGIER & LUMINAIS, LLP*
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
*Attorneys for Defendant,
Albert J. Ward, Jr.*